Filed 3/21/16  In re R.H. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re R.H., a Person Coming Under the Juvenile Court Law. | |
| ERIC H., | F071269 |
| Petitioner, | (Super. Ct. No. MJP016702-R1) |
| v. | |
| THE SUPERIOR COURT OF MADERA COUNTY, | **OPINION** |
| Respondent, | |
| MADERA CO. DEPT. OF SOCIAL SERVICES/CHILD WELFARE SERVICES, | |
| Real Party in Interest. | |
| In re R.H., a Person Coming Under the Juvenile Court Law. | |
| MADERA CO. DEPT. OF SOCIAL SERVICES/CHILD WELFARE SERVICES, | F071523 |
| Plaintiff and Respondent, | (Super. Ct. No. MJP016702) |
| v. | |
| ERIC H., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Madera County.  James E. Oakley, Judge.

Gino de Solenni, under appointment by the Court of Appeal, for Defendant and Appellant, Eric H.

John LaLonde, under appointment by the Court of Appeal, for Petitioner, Eric H.

Regina A. Garza, County Counsel, and Miranda P. Neal, Deputy County Counsel, for Plaintiff, Respondent, and Real Party in Interest.

-ooOoo-

## FACTS[2]

*Prior Proceedings Initiated in 2011*

Before the dependency proceedings underlying the present appeal, minor R.H. was the subject of a separate dependency case in 2011 through 2012.  In that earlier case, "it was alleged that R.H.'s mother, Stacey F. ('Mother'), had been arrested for several alleged crimes, including willful harm or injury to a child in her care or custody."  (*In re R.H.*, *supra*, F067623 at p. 3.)[3]  The children were initially declared dependents of the court, but were allowed to be returned to Mother at the discretion of the Madera County Department of Social Services/Child Welfare Services (the "Department").  The dependency case was eventually dismissed in October 2012.

*Current Proceedings Initiated in 2013*

In March 2013, the Department filed a Welfare and Institutions Code section 300 petition involving R.H. and two other children:  Z.F. and newborn S.T.  "The petition alleged that S.T. had been born four days earlier and tested positive for

---

[2] Our summary of events preceding the first appeal in this case is largely taken from our May 12, 2014, opinion in appeal number F067623.  (*In re R.H.* (May 12, 2014, F067623) [nonpub.opn.].)

[3] The Department requests we take judicial notice of our prior opinion in case No. F071269.  We grant that request.

2.

methamphetamine. Mother also tested positive for methamphetamine." (*In re R.H.*, *supra*, F067623 at p. 4.)

"The petition also alleged that S.T.'s father, Charles T., had admitted to smoking marijuana in the home where S.T. was born, one hour before her birth. Z.F. and R.H. were allegedly present in the home while Charles T. smoked marijuana. The petition alleged all three children faced substantial risk of serious physical harm and/or neglect due to Mother's substance abuse.

"One of the Department's subsequent reports indicated that hair follicle samples were taken of Mother, Charles T., Z.F. and R.H. on March 19, 2013. All four individuals tested positive for amphetamines and methamphetamine.

"… Mother claimed [a man named] Jason M. was the father of R.H. But, she admitted that Jason M. 'was not present at the birth, is not listed on the birth certificate, [and] has never lived with her and the minor.' " (*In re R.H.*, *supra*, F067623 at pp. 4–5, fn. omitted.)

In actuality, appellant/petitioner Eric H. ("Father") is the biological father of R.H.

"A report by the Department indicates that on March 25, 2013, Father came in to the Department's office to speak with the social worker [concerning] R.H.'s case. The receptionist indicated that Father was being 'demanding.' The social worker spoke with Father. Father was 'mad' that no one at the Department knew where his daughter was. Father conveyed that he was R.H.'s biological father as demonstrated by the genetic testing. Also, father referenced a child support order. He also said he had visited with R.H. three weeks prior. Father requested a visit with R.H. The social worker told Father that there was a court hearing scheduled for April 9, 2013. Father said he did not want to wait and would file papers with the court sooner. Father said he did not know why Mother did not try to keep R.H. out of foster care by telling the social worker that he was R.H.'s father. Father told the social worker that if Mother would not protect R.H. from foster care, he would. The social worker said she needed to contact Child Support

3.

Services to 'get the records'—presumably referring to the child support order Father had mentioned.  The social worker gave Father her business card.  Father delivered the child support order to the Department later that day.  The social worker said Father was 'agitated' and speaking quickly.

"On March 26, 2013, the Department received a call from the Madera Police Department indicating that Father was complaining the Department was keeping him from seeing R.H.  The same day, the Department received a call from the Madera Sheriff's Department indicating that Father 'was at their office regarding his child, [R.H.], being placed in foster care.'  Unidentified staff at the sheriff's department said Father was agitated and 'appeared to be under the influence of a controlled substance.'

"On March 26, 2013, the social worker met with Mother and Charles T.  The social worker conveyed the results of the March 19, 2013, hair follicle tests.  Mother and Charles T. expressed 'shock[]' because they claimed not to have used methamphetamine.  They said that Father 'had been coming to their home and was buying them and the kids drinks and he must have been putting methamphetamine in the drinks.' They said that Father 'slams meth,' prompting the social worker to ask why they would let Father around their daughter.  The social worker also told them that the levels of methamphetamine found in R.H.'s sample were not consistent with their theory.  The Department concluded both Mother and Charles T. 'were in denial.'

"On March 28, 2013, Mother and Charles T. failed to come to a scheduled visitation with their children." (*In re R.H.*, *supra*, F067623 at pp. 5−6.)

Initial Jurisdictional Hearing on April 11, 2013

The jurisdictional hearing was held on April 11, 2013.  Father's counsel indicated he and his client " 'do not have an issue with the court taking jurisdiction based on these allegations.' " (*In re R.H.*, *supra*, F067623 at p. 7.)  The court assumed jurisdiction and ordered the children remain in the Department's care and custody.

4.

Initial Disposition Hearing on July 11, 2013

The dispositional hearing was held on July 11, 2013. Father was inexplicably absent. (*In re R.H.*, *supra*, F067623 at p. 10.) The court declared R.H. a dependent of the court and permitted the Department to place her " 'in any suitable placement in conformity with applicable legal requirements.' " (*Id*. at p. 11.)

Prior Appeal

Father appealed to this court, arguing the dependency court failed to advise him of his rights under California Rules of Court, rule 5.682. (See *In re Monique T*. (1992) 2 Cal.App.4th 1372.) In an opinion filed May 12, 2014, we reversed the "jurisdictional and dispositional findings and orders" as to Father and the placement of R.H. (*In re R.H.*, *supra*, F067623 at p. 17.) Our opinion included the following directions:

> "On remand, the court shall advise Father of his rights under [Rules of Court,] rule 5.682. Assuming Father elects to present evidence at a contested hearing, the court shall thereafter determine whether Father is entitled to elevated fatherhood status and whether he is entitled to placement of R.H. under section 361.2." (*Ibid.*)

The remittitur issued on July 14, 2014.

Post-Remand Jurisdictional/Dispositional Hearing on December 15, 2014

A jurisdictional and dispositional hearing was held on December 15, 2014. Father's counsel indicated that Father was planning to sign a relinquishment of R.H. pursuant to Family Code section 8700.[4] The Department indicated that it was prepared to work with Father "on his plan to relinquish the child for adoption." Father then waived his rights to a trial and submitted on the petition. The court elevated Father to presumed father status. (See Fam. Code, § 7611, subd. (d)). The court also made the following

---

[4] Family Code section 8700 permits a birth parent to relinquish a child in writing to the Department for adoption. (Fam. Code, § 8700, subd. (a).) Generally, the filing of the relinquishment "terminates all parental rights and responsibilities with regard to the child." (Fam. Code, § 8700, subd. (j).) Subject to certain time limitations, parents may withdraw or rescind the relinquishment. (See Fam. Code, § 8700, subds. (e)(1) & (h).)

order: "[Father] has not requested that the child be placed with him. He has not requested that custody of the child be given to him immediately or in the near future and therefore is not entitled to family reunification services. [*In re Terry H.* (1994) 27 Cal.App.4th 1847.][4] [Father] has stated that he wishes to relinquish the child for adoption pursuant to Family Code Section 8700." The court also scheduled a Welfare and Institutions Code[5] section 366.26 hearing for Mother and Father on January 6, 2015.

Section 366.26 Hearing on February 11, 2015

The section 366.26 hearing was continued several times and eventually held on February 11, 2015. Father's counsel told the court that Father had signed the paperwork relinquishing R.H. earlier that day and, as a result, "the need to terminate his parental rights through any court proceeding today is not necessary anymore." The court proceeded with the hearing as to Mother and ultimately terminated her parental rights.

Father Requests to Rescind his Relinquishment of R.H.

On February 20, 2015 the Department received a Request for Rescission of Relinquishment from Father. In response, the Department asked the court to schedule a section 366.26 hearing to terminate Father's parental rights.

Father's Section 388 Petition

On March 16, 2015, Father filed a request under section 388[6] for a court order granting him custody of R.H. and dismissing the dependency case. In the section 388 petition, Father expressly said "[h]e is not asking for reunification services." However, the petition later says Father "requests assistance with housing, then a gradual transition of his daughter from foster care to his care."

---

[4] Superseded by statute as noted in *In re Nolan W.* (2009) 45 Cal.4th 1217, 1233, fn. 7.)

[5] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[6] Father's request to change court order did not cite section 388, but both parties on appeal refer to it as a section 388 petition. We will do so as well.

6.

Without objection, a section 366.26 hearing was set for April 29, 2015, and Father's section 388 petition was set to be heard at the same time. A few days later, however, Father's counsel requested that the section 388 petition be heard before and apart from the section 366.26 hearing. The court denied Father's request to hear the matters on separate days, but ruled that it would hear the section 388 petition before proceeding "immediately" to the section 366.26 hearing on April 29. On April 27, 2015, Father filed a writ petition in this court challenging the dependency court's order setting the section 366.26 hearing. We consolidated that writ petition with the present appeal.[7]

Joint Section 388 and 366.26 Hearing on April 29, 2015

The joint hearing was held as scheduled on April 29, 2015. Father was the sole witness to testify at the hearing.

Father was asked whose idea it was to relinquish R.H. Father testified that it was "basically my decision to – to relinquish my parentage, but I was – had a hard time doing it, you know." Father's counsel asked if anyone pressured him to relinquish R.H. Father said that he did feel pressured and "felt as if … my presumed father's status was contingent on giving up my parental rights …." Father also testified that he was upset that he had never received "any help … for my daughter and me."

Father was asked why he was "not asking for family reunification services?" Father responded that he was not requesting family reunification services because he has had "very, very bad" experiences with "CPS" in the past. However, Father said he was now requesting "assistance with housing." Father's counsel later asked the following

---

[7] The Department filed a letter with this court indicating that it "disagrees" with Father's position but was declining to file a brief in response to Father's writ petition because the issue he raised concerned the scope of this court's remand order in the prior appeal.

The fact that issues raised by a writ petition may concern the scope of prior orders or opinions from this court does not negate the usefulness of a brief from all parties. The Department's bare assertion that it "disagrees" with Father's position without elaboration is unhelpful.

7.

question: "The County says that they provided you with family reunification services that requires participation between the social worker and the parent in development of a case plan. Do you remember discussions with any social worker about a case plan for you?" Father responded that he did remember, albeit "vaguely."[8] Father was later asked: "And you testified that when you were originally granted a period of time to try to reunify and get [R.H.] into your care, you did not want to engage in the case plan. Why is that?" Father replied that he "felt as if the County had it in for me…."

Father later said he wanted the County to help him "get into some housing." Later in the hearing the following exchange occurred:

> "[Father's Counsel:] I just would like to clarify, I understand that you indicated that you want a transitional period, and it looks like you want some assistance with housing. Correct?
>
> "[Father:] Um-hum.
>
> "[Father's Counsel:] So are you looking more for reunification services, or are you looking more for the Court to immediately place the child and dismiss the case?
>
> "[Father:] *I think that that's what should happen, is … they should give me custody of my daughter and dismiss the case.* I'm saying in good faith I'm not just going to go over there and take her and rip her out of these people's lives. I'm saying I do not need assistance with housing to provide her with a home where I'm in control of the environment, and I'd like to be given that opportunity …." (Italics added.)

Father said he did not have enough money to live on his own and had no money set aside for R.H. His only source of income was "SSDI."[9] However, Father believed he could increase his "available money" once he regained custody of R.H. because there were "some Social Security benefits that can be paid for … her …."

---

[8] Later in the hearing, Father testified that he "can't say any services were offered other than visitation with my daughter, which were canceled twice."

[9] "SSDI" is presumably a reference to Social Security disability insurance. (See *In re Marriage of Hopkins* (2009) 173 Cal.App.4th 281, 283–284.)

8.

Father was asked if he had a response to the Department's claim that it "had trouble knowing where you live." Father testified: "Yeah, maybe I had some kind of Post Traumatic Stress Disorder going on or something, but I've kind of got a little bit of fear of the county officials knowing exactly where I'm at, so I move around and … they don't really actually know where I live." Later, Father elaborated that "I have a certain maybe unfounded fear that, you know, I'm being plotted against. You know, that's part of my condition, you know, but you, you know, I kinda [*sic*] little paranoid, you know."

Father testified that he was currently living with a friend but planned to live at "the Rescue Mission." Father said he figured that "since I don't have a place to live, that would be a good place to start if I've got custody with my daughter." County counsel asked, "Isn't it true that at the Mission you could spend the night there, but you must leave during the day?" Father replied that he did not know what the "rules" were and was waiting to see what happened with the dependency case that day.

Father testified that he has "bipolar disorder with psychotic tendencies." In the past, Father would get "really depressed and stay in bed for a week at a time." To maintain his mental health, Father now exercises, eats well, and goes to "counseling." On cross-examination, Father admitted he does not take medication for his condition because of side-effects including risk for diabetes and obesity. He also acknowledged that he does not attend counseling with any mental health professionals.

Father's counsel asked "how are you managing your anger these days?" Father responded that "sometimes my anger will come out and … I might yell at somebody, but … exercising is a good way to … keep my mood level stable. And, you know, I don't see anything wrong with expressing anger, you know, if I don't do anything. I haven't done anything to hurt anybody in that aspect. If I get upset and I yell at somebody, there's nothing unacceptable about that."

Father testified it had "probably been at least eight … months" since he last used drugs. Father claimed he was currently clean and sober, and attends counseling with his

9.

pastor. However, Father testified on cross-examination that he could not recall whether he had completely avoided methamphetamine use during 2013.

Father testified that R.H. has never lived with him alone. Before R.H. was removed from Mother in March 2013, he would visit her once every one to two weeks. He would take R.H. and other children staying with Mother to the pool and watch movies with them.

Father admitted on cross-examination that he thought R.H. was being neglected while in Mother's care before removal. Father knew, in his own words, that R.H. was not being clothed or bathed properly, and that Mother's home had maggots in the kitchen sink and "bugs flying around." However, since R.H.'s maternal grandmother was a dispatcher for the Madera Police Department, Father believed that if he "complained" he would not be able to see his daughter. Father never asked Mother if R.H. could stay with him. Father said that "after everything that I've experienced and what I've been through in this case, I would do something differently now than I would have then."

Father said that often R.H. would come up and give him a hug, but that "lately" she had been "a little bit shy about it, because it's getting to be a lot of time here that I'm not spending with her." Father said that during his more recent visits, Father would play blocks with R.H. and have her color on paper. He also brings snacks for R.H. to their visits. At the end of one visit, R.H. asked if she could go home with Father.

Father acknowledged that R.H.'s foster family offered to allow him to speak with R.H. over the phone. Father also acknowledged that he had not spoken to R.H. over the phone in the last five months. Father said he had trouble "getting a hold of" R.H.'s foster father and that R.H.'s foster mother did not speak English. County counsel asked whether he could have learned how to say "can I talk to my daughter" in Spanish. Father admitted he could have learned how to say that, but he was "[m]ore focused on getting ready for this [i.e., the hearing] and finding out what I can do to get my daughter, and taking up some things to clear up my criminal record …."

Court's Ruling

On May 4, 2015, the court denied Father's section 388 petition and terminated his parental rights.[10] The court observed that Father "by his own admission, used illegal drugs throughout his adult life." "Further, [Father] testified that it has only been eight months since he last used drugs, that he used drugs with the mother in 2010, the year in which [R.H.] was born, and that he could not testify that he had not used drugs sometime in the year 2013. Clearly, his problem with the use of illegal drugs is not simply a matter of youthful indiscretions from years ago …." The court also cited Father's repeated refusals to submit to drug testing.

The court then noted that Father admitted "he was fully aware of the unsafe conditions in which [R.H.] was living with the mother at the time prior to the Department intervening, but did nothing to intercede."

Next, the court observed that Father admitted to suffering from psychotic tendencies during his adult life and that he "stopped taking … medication because of the effect that it had on his physical health, which he viewed as outweighing the need to address his mental health."

The court also recounted that Father had only visited R.H. eight times since her removal in March 2013, with the last time being about two months ago. And Father had not spoken with R.H. by phone for more than five months. The court concluded that Father had failed to maintain any significant contact with R.H. and that "no bond exists between [Father] and [R.H.]."

Father appeals the denial of his section 388 petition and the termination of his parental rights.

---

**10** Prior to the consolidation of the writ petition and the appeal, the Department requested that we take judicial notice of the court's May 4, 2015, minute order. Since that minute order is in the appellate record, we will deny the request as moot.

11.

## DISCUSSION

**I.    The Dependency Court Did Not Violate Father's Due Process Rights When it Denied his Section 388 Petition and Terminated his Parental Rights**

### A.    The Record Does Not Support Father's Claim that the Dependency Court Applied the Wrong Legal Standard

Father contends the dependency court violated his due process rights because it applied "the wrong legal standard when it determined that placing R.H. with Father would be detrimental to her within the meaning of section 361.2, subdivision(a)." Specifically, Father claims the court erroneously focused on his perceived shortcomings rather than how placement with him would affect R.H.'s safety, protection and well-being.  We conclude the two are not mutually exclusive.

The nature and extent of Father's "shortcomings" are highly relevant to whether placement of R.H. with him would be detrimental to her.  There is no reason to think the dependency court was solely focused on Father's problems to the exclusion of the detriment issue.  To the contrary, the record indicates that the court was considering Father's "shortcomings" in the context of its detriment finding.  After recounting the evidence of Father's unfitness, the court concluded:  "Viewing the evidence from the perspective of the best interest of [R.H.], it is exceptionally clear that *it would be detrimental to her to have her placed in the custody of the father* who the court does find to be an unfit parent."  (Italics added.)  In other words, the court found that placement with Father would be detrimental to R.H. *because of* his "shortcomings."

The record does not support Father's claim the dependency court applied the wrong standard in determining whether to place R.H. with him.[11]

---

[11] Father argues that the dependency court's error warrants automatic reversal. We do not address this contention because we find no error.

12.

**B.** **The Dependency Court's Finding that Placement of R.H. With Father Would be Detrimental was Supported by Substantial Evidence**

Father next contends that even if the dependency court applied the correct legal standard, its finding of detriment is not supported by substantial evidence. We disagree.

As the dependency court noted, Father had a long history of drug abuse and could only say that it had been "probably been at least eight … months" since he last used drugs. On appeal, Father contends that there was no evidence he was "currently using methamphetamine." But the dependency court was free to consider Father's drug use even if there was no evidence Father was "currently" using. As the court expressly found, Father's history of drug use was extensive and "not simply a matter of youthful indiscretions from years ago …." A dependency court may consider a parent's past if there is reason to believe the problems would recur in the future.

The dependency court also relied on Father's admitted psychotic tendencies and the failure to take medication for the condition. Father contends this reliance was improper because at the hearing he detailed the steps he employed to manage the symptoms of his condition. Again, the dependency court was free to conclude that the steps Father was taking – including exercising and counseling with someone other than a mental health professional – were no replacement for medication and mental health counseling. Father's contention might be more persuasive if there were absolutely no evidence his mental health condition ever warranted medication. However, Father testified that he had been taking medication for the condition in the past, but stopped because of side effects such as obesity and increased risk of diabetes.

The dependency court also described Father's failure to intervene on behalf of R.H. before her removal in 2013 even though he knew she was not receiving proper care from Mother. Father contends this factor cannot support a finding of detriment because he was in the process of "seeking a paternity action and had taken steps to have a child support order established." Quite simply, this is not what the dependency court was talking about. Instead, the dependency court was rightfully concerned that Father knew

13.

R.H. was being neglected by Mother and was living in a home with maggots in the kitchen sink and yet did not "complain[]" because R.H.'s maternal grandmother was a dispatcher for the Madera Police Department.

In sum, the dependency court's finding that placement of R.H. with Father would be detrimental to her is supported by substantial evidence.[12]

## II. Father has Failed to Establish that the Dependency Court Violated his Rights by Failing to Order Reunification Services

Father contends his "rights were violated because there was insufficient evidence to support the requisite finding that reasonable services had been offered or provided to him."[13]

---

[12] Father cites cases like *Santosky v. Kramer* (1982) 455 U.S. 745, and *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242 and argues that he has a constitutional right to multiple findings of unfitness before his parental rights can be terminated. We acknowledge that, usually, "[b]y the time termination is possible under our dependency statutes the danger to the child from parental unfitness is so well established that there is no longer 'reason to believe that positive, nurturing parent-child relationships exist' [citation]…." (*Cynthia D.*, *supra*, 5 Cal.4th at p. 256; but see § 366.26, subd. (c)(1)(B)(i).) However, those types of findings are usually made at the jurisdiction and dispositional hearings. At the jurisdiction/dispositional hearing in this case, Father expressly told the court he was relinquishing his parental rights. Similarly, at the section 366.26 hearing on February 11, 2015, counsel indicated that Father had signed the paperwork relinquishing R.H. earlier that day and that "the need to terminate his parental rights through any court proceeding today is not necessary anymore." Thus, the absence of prior unfitness determinations is a result of Father's own conduct and he cannot claim error now. (Cf. *In re A.A.* (2012) 203 Cal.App.4th 597, 605 ["Where the noncustodial parent does not seek custody, there is no need to address any risk that might arise from placement with him or her."].)

[13] Father styles this argument slightly differently in his writ petition to this court. There he contends that the dependency court "improperly relied" on a March 2014 finding – which was later reversed by this court – that Father had been provided reasonable services. But the reversed March 2014 dispositional order is not what the court "relied on" in addressing the issue of services. Instead, the court concluded in its December 2014 dispositional order that Father was *not entitled* to reunification services at all because he was relinquishing R.H.

14.

Father cites section 361.2, subdivision (a) for the proposition that "a noncustodial parent like Father is *entitled* to reunification services when they have requested custody of the children." (Italics added.) Section 361.2 says no such thing. Instead, it provides that, in certain circumstances, a child may be placed with a noncustodial parent (§ 361.2, subd. (a)), and that *if* the child is *placed* with the noncustodial parent, the court *may* order services be provided to the noncustodial parent. (§ 361.2, subd. (b) & (b)(3), italics added.) In other words, section 361.2's provisions concerning services (i.e., subdivision (b)(3)) apply when the child is *placed* with the noncustodial parent. However, when, as here, a noncustodial parent is *denied* placement, the grant or denial of services is governed by section 361.5, not section 361.2. (*In re Adrianna P.* (2008) 166 Cal.App.4th 44, 54.)

Here, the dependency court based its decision to deny services on *In re Terry H.*, *supra*, 27 Cal.App.4th 1847, which concluded that "the failure to order a reunification plan arises from [the noncustodial parent's] own failure to request custody …." (*Id.* at p. 1857.) Father challenges the trial court's conclusion, claiming it "ignores the entire record which indicates that Father was willing to assume custody of R.H. from the moment he found out about the proceedings."[14] As we explain below, this claim is inaccurate – Father has not consistently sought custody of R.H. "from the moment he found out about the proceedings."

At the December 15, 2014 jurisdictional/dispositional hearing in this case, Father's counsel indicated that he planned to relinquish R.H. Accordingly, the court ordered that "[Father] has not requested that the child be placed with him. He has not requested that custody of the child be given to him immediately or in the near future and therefore is not entitled to family reunification services. [] [Father] has stated that he wishes to relinquish

---

[14] Father does not rely on section 361.5, subdivision (b)(14), which concerns certain instances where a parent does not seek custody or services. (§ 361.5, subd. (b)(14).) We do not address whether an objection predicated on that statute would have warranted a different outcome in this case.

the child for adoption pursuant to Family Code Section 8700." So while Father may have sought custody of R.H. at various times earlier in the proceedings, he did not do so at the dispositional hearing when the decision regarding reunification services was made. (See § 361.5, subd. (c) ["In deciding whether to order reunification in any case in which this section applies, the court shall hold a dispositional hearing."].) Similarly, at the section 366.26 hearing on February 11, 2015, counsel indicated that Father had signed the paperwork relinquishing R.H. earlier that day and that "the need to terminate his parental rights through any court proceeding today is not necessary anymore." Given this history, Father's eleventh hour request for assistance with housing cannot defeat the court's order terminating parental rights. To endorse a contrary rule would be to encourage gamesmanship and disrupt the stability our dependency law seeks to ensure. Otherwise, parents would be able to represent to the court at the dispositional hearing that they did not wish to retain their parental rights and then change course and request services at the last minute, with the result of significantly lengthening proceedings aimed at securing a stable home for children.

## III. Father has Failed to Establish Prejudicial Ineffective Assistance of Counsel

Father next claims that he received ineffective assistance of counsel.

To prevail on an ineffective assistance of counsel claim, "Father must demonstrate both that: (1) his appointed counsel failed to act in a manner expected of reasonably competent attorneys acting as diligent advocates; and that (2) this failure made a determinative difference in the outcome, rendering the proceedings fundamentally unfair in that it is reasonably probably that but for such failure, a determination more favorable for Father's interests would have resulted." (*In re Diana G.* (1992) 10 Cal.App.4th 1468, 1479.)

Father claims his counsel was ineffective by failing to request presumed father status earlier in the proceedings. He contends this failure prejudiced him because it is "reasonably probable" that he "may" have received services if his counsel had requested

16.

presumed father status earlier. However, the record does not support Father's theory of prejudice. The reasons Father did not receive services are that, at various times, he either (1) was expressly planning to relinquish R.H.; (2) failed to request services; or (3) expressly indicated that he did not want services. The record does not support Father's claim that an earlier request for presumed father status would have affected whether he received services.

Father next argues that his counsel rendered ineffective assistance by failing to request a "contested hearing on the issue of whether Father's services should be terminated." However, Father testified at the section 366.26 hearing that the reason he had not requested reunification services was due to "very, very bad" experiences he had with "CPS" in the past. Father was also asked: "And you testified that when you were originally granted a period of time to try to reunify and get [R.H.] into your care, you did not want to engage in the case plan. Why is that?" Father replied that he "felt as if the County had it in for me …." This testimony indicates that Father did not request services because he did not trust the Department. Consequently, Father cannot now fault his trial counsel for failing to request services. That is, Father has not shown that counsel's "failure" to request a contested hearing regarding the provision of services was a result of ineffective assistance rather than counsel complying with Father's own wishes.

Father also argues that trial counsel rendered ineffective assistance by failing to object to "the lack of information regarding Father in the status review reports prepared for the review hearings." Regarding prejudice, he contends that it is "reasonably probable" that "if more information about what services had been provided to Father had been included in the reports, Father may have received additional services." We do not follow this reasoning. Regardless, the true reason Father did not receive services was that he was expressly relinquishing his rights to R.H. at the jurisdictional/dispositional

17.

hearing Father has not shown how additional information in status reports would have altered the court's determination of the services issue.[15]

## DISPOSITION

The court's orders denying Father's section 388 petition and terminating his parental rights are affirmed. Father's petition for extraordinary writ is denied.

_____
POOCHIGIAN, J.

WE CONCUR:

_____
GOMES, Acting P.J.

_____
DETJEN, J.

---

[15] Father also indicates that without counsel's alleged deficiencies, it is reasonably probable he could have raised the beneficial relationship exception to termination of parental rights. (§ 366.26, subd. (c)(1)(B)(i).) We do not agree. The dependency court found that Father had not established a significant bond with R.H. The factors on which the court relied in making this determination were not substantially related to the alleged shortcomings of counsel that Father now identifies. Thus, it is not reasonably probable that Father would have been able to invoke the beneficial relationship exception absent counsel's purportedly ineffective assistance.

18.